******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

D'AURIA, J., concurring in part and concurring in the judgment. In this certified appeal, the majority once again holds that the legislature has stripped the courts of this state of their inherent common-law authority to open, correct, or modify a judgment, today, a judgment of dismissal following a defendant's completion of a diversionary program. I disagree that our courts have been legislatively dispossessed of this inherent authority, but, because I agree that the trial court should have denied the state's motion to open in this particular case, I concur in the judgment.

We have long recognized that, at common law, courts of general jurisdiction in this state had inherent power to open, correct, or modify judgments. See, e.g., *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 469, 239 A.3d 272 (2020); *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 106, 952 A.2d 1 (2008). This principle is deeply rooted in our common law and reflects the beneficent policy that courts should be able to admit and correct mistakes, whether their own mistakes or those of the parties, to do justice. See *State* v. *Luzietti*, 230 Conn. 427, 440, 646 A.2d 85 (1994) (*Katz, J.*, dissenting) ("we should recognize the trial court's inherent power to correct errors of substance within a reasonable time in order to do justice"). Historically, this included the authority to grant a motion for a new trial, which is a "[common-law] power [that] the courts . . . have the right to exercise in such a manner as shall best promote justice." *Zaleski* v. *Clark*, 45 Conn. 397, 404 (1877).

It has never been questioned—and neither the parties nor the majority in the present case questions—whether the general common-law rule that courts have inherent authority to open, correct, or modify judgments applied equally to all courts of general jurisdiction, which, in Connecticut, include criminal courts. See *State* v. *Ramos*, 306 Conn. 125, 133–34, 49 A.3d 197 (2012) ("The Superior Court is a constitutional court of general jurisdiction. In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Internal quotation marks omitted.)). For purposes of my discussion here, I will assume the same. The majority assumes, too—or does not challenge—that this common-law authority, as late as 1978, extended to the authority of courts to open, correct, or modify judgments dismissing criminal charges.

Because the policy favoring the finality of judgments competes with the beneficent policy permitting courts to rectify their mistakes, litigation has usually centered on how long and under what circumstances courts should be able to exercise their inherent power to open, correct, or modify their judgments. See, e.g., *People* v. *Karaman*, 4 Cal. 4th 335, 348, 842 P.2d 100, 14 Cal.

Rptr. 2d 801 (1992) (recognizing that common-law rule "that the trial court may change its judgment only during the term in which the judgment was rendered, but not thereafter . . . was established in order to provide litigants with some finality to legal proceedings" (citations omitted; footnote omitted)). The present case is only the most recent example of this court's often tortured attempts to accommodate these competing public policies, which sometimes results in manufactured rules; see *State* v. *Wilson*, 199 Conn. 417, 437, 513 A.2d 620 (1986) (borrowing civil rule of practice providing for four months to open judgments); exceptions to exceptions to those rules; see *State* v. *Myers*, 242 Conn. 125, 131, 136, 698 A.2d 823 (1997) (court had jurisdiction to rule on motion for new trial based on juror bias five months after defendant had been sentenced); and, most recently, in the present case and in *State* v. *McCoy*, 331 Conn. 561, 586–87, 206 A.3d 725 (2019), in the overruling of the exceptions to the exceptions (i.e., *Wilson* and *Myers*) in an attempt to clean up our case law and make the lines brighter.

*McCoy* involved the question of whether there was, or ought to be, an exception to the common-law, temporal limitation on the court's inherent authority to correct its mistakes—that is, that the trial court loses jurisdiction over the case when the convicted defendant is committed to the custody of the Commissioner of Correction and begins serving his sentence—that would permit the trial court to rule on a timely filed motion before the court had sentenced the defendant. Id., 574–75. The majority in *McCoy* answered this question in the negative: i.e., our law could not abide such an exception and, to the extent that we had permitted such an exception in the past, threw shade on our precedent. See id., 588–89; see also id., 583 (expressing "serious concerns" about *Myers'* "rationale and the implications . . . were we to follow it without question"). As I explained in my concurrence and dissent in *State* v. *McCoy*, supra, 331 Conn. 600 (*D'Auria, J., Palmer* and *McDonald, Js.*, concurring in part and dissenting in part), I believe the majority's holding in that case created an illogical result and was avoidable if we had acted like the common-law court we are and found exceptions to a rule—or relied on existing exceptions—when good sense calls for it. As in *McCoy*, the rule at issue in the present case is "a common-law rule borne out of experience and sensibility"; O. Holmes, The Common Law (P. Pereira & D. Beltran eds., 2011) p. 5; and "this court has the inherent power to define its contours to ensure that its application does not lead to unsensible and unjust results . . . ." *State* v. *McCoy*, supra, 614 (*D'Auria, J.*, concurring in part and dissenting in part). I will not repeat the entirety of that analysis here.

In the present case, I believe that the majority repeats the error of *McCoy* and earlier cases by assuming—indeed, holding—that the legislature in 1977 abrogated

the authority of our courts to open, correct, or modify judgments and that it did so by eliminating the word "sessions" from General Statutes (Rev. to 1977) § 51-181. See Public Acts 1977, No. 77-576, § 27 (P.A. 77-576). I agree with the majority that the common-law rule, as measured by sessions of the court, is now obsolete. But, in my view, the notion that this legislative change abrogated our trial courts' inherent authority to open, correct, or modify judgments is not an inescapable conclusion. Rather, I would conclude that courts of this state still have this authority, even though fashioning a rule in the context of this case—the unappealed judgment dismissing a criminal case—might present challenges that cannot be overcome.

It is necessary first to review some of the history of General Statutes § 51-181 and, in doing so, to bear in mind our general rule of construction that, when a statute seeks to limit a court's common-law jurisdiction, we strictly construe that statute so as to limit any incursion on our authority only to the extent expressly and explicitly stated by the legislature. See, e.g., *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 324–25, 968 A.2d 396 (2009) (explaining that legislature knows how to expressly limit scope of court's jurisdiction, and, if no intent to limit is expressed, then statute does not divest court of jurisdiction). This rule of construction is consistent with the even more general rule that the court's common-law general jurisdiction is broad and that "there is a strong presumption in favor of jurisdiction"; *State* v. *Ramos*, supra, 306 Conn. 134; and is a concrete application of the well established maxim that we must strictly construe statutes in derogation of the common law. See, e.g., *Fennelly* v. *Norton*, 294 Conn. 484, 505, 985 A.2d 1026 (2010). We must also keep in mind that the Superior Court is a court of general jurisdiction, and, therefore, "[i]n the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 133–34.[1]

As the majority correctly notes, at common law, courts had the inherent power to open, correct, or modify their own judgments. This authority was limited in duration, however. Nearly 150 years ago, we described that limitation as follows: "During the continuance of a term of court the judge holding it has, in a sense, absolute control over judgments rendered; that is, he can declare and subsequently modify or annul them." *Sturdevant* v. *Stanton*, 47 Conn. 579, 580 (1880). Over 100 years later, and since then, we have indicated that, at common law, "a trial court possesses the inherent power to modify its own judgments during the term at which they were rendered." *State* v. *Wilson*, supra, 199 Conn. 436; see also *Snow* v. *Calise*, 174 Conn. 567, 571–72, 392 A.2d 440 (1978).[2] At common law, even when the term had not yet ended, a trial court did not

have jurisdiction to modify its judgment after a person had begun to serve his or her sentence. See *State* v. *Henkel*, 23 Conn. Supp. 135, 138, 177 A.2d 684 (Conn. Cir. 1961) ("[w]hile the established rule is that [a] sentence in a criminal case may be modified at any time during the term of court at which it was imposed, such modification cannot be made after an act has been done in execution of it" (internal quotation marks omitted)). There are, however, common-law exceptions to this general rule, one being that trial courts retain jurisdiction after sentencing to correct an illegal sentence. See, e.g., *State* v. *Parker*, 295 Conn. 825, 835–36, 992 A.2d 1103 (2010). There is also a common-law exception recognizing that trial courts have "inherent" power, "independent of [any] statutory provisions," to open a civil judgment "obtained by fraud" "in the actual absence of consent, or because of mutual mistake" at any time. *Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d 837 (1980).[3]

Prior to 1965, § 51-181 provided that there "shall be such sessions of the superior court . . . held annually . . . at such times and such places and for such duration of time as is fixed and determined by the chief judge of the superior court . . . ." General Statutes (Cum. Supp. 1963) § 51-181. Therefore, the duration of time in which courts had the jurisdiction to open, correct, or modify their judgments was limited by the chief judge's decision regarding how long the sessions were to be held. In 1965, the legislature amended § 51-181 to specify that the court "shall be deemed continuously in session with four quarterly sessions . . . held on the second Tuesday of September, December, March and June annually . . . at such times and places and for such duration of time as is fixed . . . by the chief judge of the superior court . . . ." Public Acts, Spec. Sess., February, 1965, No. 331, § 21, codified at General Statutes (Cum. Supp. 1965) § 51-181. This further limited the duration in which courts could open their judgments because, although the chief judge still retained authority to set the duration of the sessions, each session had to begin on a particular day and end by the next specified start date.

In 1977, the statute was modified to remove any reference to sessions, providing that "[t]he superior court shall sit continuously throughout the year, at such times and places and for such duration of time as is fixed and determined by the chief court administrator . . . ." P.A. 77-576, § 27 (effective July 1, 1978). This statutory change was accomplished alongside numerous other statutory changes—including the reorganization of judicial districts and the increase of salaries of judges. See generally P.A. 77-576. This modification to § 51-181 was one section of a sixty-five section bill the purpose of which was to ensure an efficient transition to the reorganized, one tier court system that the legislature established the previous year; see Public Acts 1976, No. 76-

436; which merged the Court of Common Pleas and the Juvenile Court with the Superior Court. When testifying in favor of the bill before the Judiciary Committee, a representative from the Office of the Executive Secretary of the State Judicial Department[4] noted that, since the merger of the courts in 1976, there was confusion regarding the use of the words "term" and "session." See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1977 Sess., p. 1360, remarks of Harriett Rosen. This bill clarified that confusion in part by keeping language that was already present in the statute—that the court was "continuously" in session—but removing the reference to "sessions." P.A. 77-576, § 27. Thus, the legislature removed the time frame for when a trial court could exercise its inherent authority to open, correct, or modify judgments. There is nothing in the alterations to the statutes governing the court system, however, that explicitly divests the courts of their inherent authority to open, correct, or modify judgments.

Concurrently with this change, in § 28 of P.A. 77-576, which was codified at General Statutes (Rev. to 1979) § 52-212a, the legislature established what is now referred to as the "four month" rule. General Statutes (Rev. to 2019) § 52-212a provided that, "in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed." In other words, having explicitly removed the time frame for when the court may exercise its inherent authority to open, correct, or modify judgments, the legislature filled in the gap by creating the four month rule, explicitly divesting the court of its common-law authority to open, correct, or modify judgments in civil cases. See General Statutes (Rev. to 2019) § 52-212 (a). No similar statute was enacted for criminal judgments. However, just because the legislature provided a specific rule for civil judgments does not necessarily mean it intended to eviscerate a court's jurisdiction in criminal cases to open, correct, or modify. This begs the question: assuming that jurisdiction previously existed, what happened to the court's inherent common-law authority to open, correct, or modify a judgment in the criminal context?

The majority infers from the legislature's removal of the reference to court "sessions" in § 51-181, a small part of a bill intended to implement an omnibus court reorganization bill, that, at the same time the legislature explicitly removed the timing of the court's sittings, it implicitly also took away the courts' common-law authority to open, correct, or modify criminal judgments. That is to say, the legislature not only removed the time frame during which the courts could exercise their inherent authority but also divested the courts of that authority entirely.

The majority reasons that "it is not appropriately within our purview to infer jurisdiction when no statutory provision exists to grant it." This is unquestionably true when we had no common-law jurisdiction in the area. But we have also said that "[t]he Superior Court is a constitutional court of general jurisdiction. In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 306 Conn. 133–34.

It is well established that, at common law, a trial court had the discretionary power to open, correct, or modify its judgment. Id., 134. This court has identified two common-law, temporal limitations on this power. The first is not at issue: that a court loses jurisdiction after a defendant's sentence has been executed. See, e.g., *State* v. *Pallotti*, 119 Conn. 70, 74, 174 A. 74 (1934). The second was that the court's jurisdiction to open, correct, or modify a judgment is limited to the term or session in which the judgment was rendered. See *Sturdevant* v. *Stanton*, supra, 47 Conn. 580. Now that the Superior Court—by legislative action—no longer sits in terms or sessions, a court term or session cannot constitute the measure of the temporal limit of the courts' jurisdiction. But I do not agree that it is ineluctable that this means the courts now lack this authority entirely. Indeed, nothing in the amendments passed in 1977 explicitly divested or limited the courts' authority to open, correct, or modify criminal judgments.

As this court must strictly construe statutes that seek to limit the courts' common-law authority, looking to the explicit language removed from § 51-181 by the 1977 amendment, why is it not as reasonable a conclusion that the legislature intended to *extend* the courts' authority to open, correct, or modify judgments by removing any temporal limitation? I disagree with the majority that the statutory changes altering the Superior Court's structure fully divested our courts of their common-law authority to open, correct, or modify criminal judgments. In my view, this reasoning too easily cedes inherent judicial authority to the legislature in a context in which I find no evidence that the legislature has sought to annex this authority for its own. In my view, upon the modest change in the statute, the judiciary retains its common-law authority to develop and adapt the common law in light of the fact that courts no longer sit in sessions. See *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 436, 54 A.3d 1005 (2012) (acknowledging that this court has "authority to adapt the common law to the changing needs of society," although not in sovereign immunity cases); see also *Western Union Telegraph Co.* v. *Call Publishing Co.*, 181 U.S. 92, 102, 21 S. Ct. 561, 45 L. Ed. 765 (1901) ("the common law comprises the body of those principles and rules of action . . . which derive their author-

ity . . . from the judgments and decrees of the courts" (internal quotation marks omitted)); *State* v. *McCoy*, supra, 331 Conn. 608 (*D'Auria, J.*, concurring in part and dissenting in part) ("[a]ccordingly, because the rule at issue is a common-law rule, this court has the authority to clarify, develop, and adapt the rule").

## II

That begs the question of what is the proper rule to apply to the opening or modification of criminal judgments under our common law. I note initially that it is unclear if the court's pre-1977 common-law authority to open, correct, or modify a judgment before the end of the session applied to the dismissal of criminal cases at all. As I will discuss, there are sound reasons why the authority to open, correct, or modify a judgment should not extend to judgments of dismissal. If this authority did not exist before 1977, then the courts do not have this authority now, and this court may not extend its jurisdiction beyond the bounds that existed at common law. See *State* v. *Ramos*, supra, 306 Conn. 133–34 ("[i]n the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law" (internal quotation marks omitted)). I am unaware of, and the parties have not cited, any case law regarding whether the common-law rule governing the opening and modification of judgments extended to criminal judgments. This might be the answer.

Absent conclusive evidence that this common-law rule did not apply to criminal judgments of dismissal, I will assume that it did. In making this assumption, I am mindful of the fact that our state courts are common-law courts; see *State* v. *Luzietti*, supra, 230 Conn. 431 ("The Superior Court is a constitutional court of general jurisdiction. . . . In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Citation omitted; footnote omitted.)); and this court is the ultimate arbiter of the scope of our courts' common-law jurisdiction. See, e.g., *Stuart* v. *Stuart*, 297 Conn. 26, 45, 996 A.2d 259 (2010) ("it is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law"). Thus, once the legislature amended § 51-181 to eliminate the word "sessions," it was for this court to then decide the impact of this change on the common-law authority to open, correct, or modify criminal judgments.

Common-law judging often involves the search for a sensible rule that accommodates the interests implicated, and, in this case, any new common-law rule would have to be limited in a way that does not enhance our common-law jurisdiction. The rule the majority announces today as a matter of first impression—that, by legislative action in 1977, courts lost their inherent authority to open, correct, or modify criminal judgments of dismissal immediately—is actually an exception to the

general rule that I have already referred to twice: that courts have inherent authority to do so. But as I explained, because the legislature has not explicitly abrogated the courts' common-law authority to open, correct, or modify criminal judgments, I disagree with the exception the majority adopts. Rather, assuming that the common-law rule historically applied to criminal judgments, a review of our relevant case law regarding jurisdiction in criminal cases provides guidance for the rule that I suggest this court could consider adopting in light of the legislature's elimination of the word "sessions" in § 51-181: that courts retain jurisdiction to open, correct, or modify a criminal judgment during the twenty day appeal period if the state places the defendant on notice at the time of judgment that it may seek to appeal.

As the majority correctly notes, the dismissal of criminal charges is a complete and final resolution of all pending charges, and, under the reasoning in *McCoy*, a trial court would lose jurisdiction following that action, similar to an acquittal. The state does have the statutory right to seek permission to appeal from any dismissal of charges pursuant to General Statutes § 54-96. This court has held that, "[u]nder § 54-96 . . . permission to appeal [is] jurisdictional because, at common law, the state had no right to appeal in criminal cases." *Simms* v. *Warden*, 230 Conn. 608, 614, 646 A.2d 126 (1994). One important limit to the state's ability to appeal is that, "to protect the rights of both the [s]tate and the accused and to have an orderly procedure, it was essential that the practice under the statute of 1886 [the original statute giving the state the right to appeal in a criminal case] should require the [s]tate's [a]ttorney or prosecutor to secure from the presiding judge permission to appeal *at the time the judgment of acquittal [or dismissal] was rendered.*" (Emphasis added.) *State* v. *Carabetta*, 106 Conn. 114, 117, 137 A. 394 (1927). In recognizing this restriction, this court in *Carabetta* acknowledged that "[t]he instances [in which a prosecutor] will not know at the time of the judgment whether or not he should appeal will be few. The consequences to [the] [s]tate and [to the] accused compel this practice, and the incidental occasional inconvenience to the prosecutor must be accepted for the larger public interests involved—the just interests of the accused and of the [s]tate and of the orderly procedure which alone can make this statute effective and serviceable. . . . It is not necessary that the prosecutor shall at the moment of judgment reach a final determination that he will prosecute the appeal. It is necessary that he determine at the time of the judgment that he ought to ask the court for permission to take such appeal, so that the accused shall not be forthwith discharged . . . ." (Citations omitted.) Id., 118–19.

This rule has been affirmed multiple times, including in *State* v. *Ross*, 189 Conn. 42, 46–47, 454 A.2d 266 (1983). The defendant in *Ross* claimed that the state's appeal

should be dismissed because of the five day delay by the state in filing its written request for permission to appeal. Id., 46. On appeal, this court noted that "[t]he evil perceived in granting a tardy request of the state to appeal was the injustice of dragging back into court a defendant who had reasonably assumed that his discharge meant that he was a free man no longer charged with a crime. *State* v. *Carabetta*, supra, [106 Conn.] 117. No such expectation could reasonably have been entertained by [the] defendants, however, because the state did express its intention to appeal at the time of judgment and the court refused to discharge the defendants when such a request was made during the proceeding. . . . The defendants were fully aware that the state intended to appeal." (Citation omitted.) *State* v. *Ross*, supra, 46. This has also become the expected course of action when the state intends to appeal from a dismissal of charges. See, e.g., *State* v. *Tucker*, 219 Conn. 752, 755–56, 595 A.2d 832 (1991); *State* v. *Rios*, 110 Conn. App. 442, 448 n.6, 954 A.2d 901 (2008); *State* v. *Tyler*, 6 Conn. App. 505, 507, 506 A.2d 562 (1986).

Because of the requirement, this court has explained that the trial court loses jurisdiction absent notice at the time of judgment that the state intends to appeal. See *State* v. *Avcollie*, 174 Conn. 100, 109, 384 A.2d 315 (1977) (holding that court retained in personam jurisdiction over defendant because state expressed intent to seek permission to appeal). When the state does provide this notice, however, the court maintains continuing jurisdiction over the case. Id. In my view, it would be a reasonable rule for this court to adopt—in the absence of court "sessions" to measure the courts' continuing jurisdiction to open, correct, or modify— that, once the state provides notice of its intent to appeal from a dismissal, the trial court retains jurisdiction to decide any motion, including a motion to open, filed within the twenty day appeal period. There is logic to this rule in that it "imposes reasonable demands on the trial attorneys to discover and disclose problems they perceive with the judgment." *State* v. *Luzietti*, supra, 230 Conn. 440 (*Katz, J.*, dissenting). It also provides the defendant with adequate notice that he may not ultimately remain a free man. See *State* v. *Middleton*, 20 Conn. App. 321, 326–27, 566 A.2d 1363 (1989) (court held that, although state did not explicitly express intention to appeal, because state took formal exception to court's ruling, defendant was on notice of possibility of appeal).

Nevertheless, even if the majority were to adopt this rule, I would have to conclude that the majority reaches the right conclusion in this particular case. Although the state could not have announced its intent to appeal at the time the charges against the defendant were dismissed, as it could not have known the information it would receive the next day, the prevailing notion that a defendant is entitled to notice that his charges may

be reinstated governs here as well. See *State* v. *Tucker*, supra, 219 Conn. 755. The state did not announce its intent to appeal from the dismissal of the criminal case or otherwise do anything to put the defendant on notice that the charges against him could be reinstated after the dismissal. Thus, at the time of judgment—the dismissal of the charges—because the state stated no intention to challenge the judgment, the trial court lost its jurisdiction. As a result, the trial court should have denied the state's motion to open because the defendant in this case would not have been on notice that the charges against him could have been reinstated. This result, however, does not necessitate the holding that the trial court does not have the inherent authority to open, correct, or modify its judgments in criminal cases because of an action taken by the legislature.

Finally, this court could decide that, without trial courts sitting in "sessions" any longer, there is no longer any sensible rule we can fashion that would appropriately cabin the trial courts' authority to open, correct, or modify criminal judgments of dismissal. We could conclude that the rule should be that courts no longer have any such authority. This would be a decision by this court, however, and would be a very different thing than concluding that the legislature removed from § 51-181 in the 1977 amendment a portion of the inherent common-law authority of our trial courts by eliminating any reference to "sessions."

Accordingly, I respectfully concur in part.

[1] The majority confuses this maxim and insists that "it is not appropriately within our purview to infer jurisdiction when no statutory provision exists to grant it."

[2] The majority correctly observes that this court has interpreted the word "term" to refer to "sessions" of the court, "as it was defined in early enactments of § 51-181." The word "term," as used in the common-law rule that a judgment may not be opened after the term during which it was rendered, has been interpreted to mean "sessions" of court, as defined in § 51-181, and not the statutory annual term provided for in General Statutes § 51-179. *Cichy* v. *Kostyk*, 143 Conn. 688, 695–96, 125 A.2d 483 (1956).

[3] As the majority notes, it is not clear whether this particular rule applies in the criminal context, and we need not reach that issue in this case.

[4] Although this position no longer exists, at the time, the Office of the Executive Secretary of the State Judicial Department was a position appointed by the Chief Court Administrator, and the individual appointed to that position handled the administration of the nonjudicial business of the Judicial Department. See General Statutes (Rev. to 1977) § 51-8.